UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**KIMBERLY R.,**

                **Plaintiff,**

v.                                                                 1:18-CV-132 (NAM)

**NANCY A BERRYHILL, Acting Commissioner**
**of Social Security,**

                **Defendant.**
_____

**Appearances:**

Counsel for Plaintiff:
Stephen J. Mastaitis, Jr.
Buckley, Mendleson Law Firm
29 Wards Lane
Albany, NY 12204

Counsel for Defendant:
Grant C. Jaquith
United States Attorney
Fergus Kaiser, Esq.
Special Assistant U.S. Attorney
Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278

**Hon. Norman A. Mordue, Senior United States District Judge:**

                **MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

        Plaintiff Kimberly R. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a decision by the Acting Commissioner of Social Security denying Plaintiff's application for Social Security Disability Insurance Benefits. (Dkt. No. 1). The parties' briefs,

filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 13, 15). After carefully reviewing the Administrative Record, (Dkt. No. 8), and considering the parties' arguments, the Court reverses the ALJ's determination, and remands for further proceedings consistent with this opinion.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for disability benefits on July 21, 2014, alleging that she had been disabled since December 31, 2003, with a date last insured of March 31, 2009. (R. 53). The Commissioner denied the claim on November 17, 2014. (R. 60). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge ("ALJ") Carl E. Stephan on July 21, 2016. (R. 33–52). On October 19, 2016, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 18–27). Plaintiff then filed a request for a review of that decision with the Appeals Council, which denied review on December 8, 2017. (R. 1–5). This action followed. (Dkt. No. 1).

### B. Plaintiff's Background

Plaintiff was born on December 10, 1966. (R. 36). At the hearing, Plaintiff testified that she lived in a mobile home with her husband. (R. 36–37). She has a high school degree and completed two years of college, receiving an Associate's Degree as a medical assistant. (R. 38–39). Plaintiff has past work experience as claims adjuster for health insurance companies, a Licensed Practical Nurse, and a medical assistant. (R. 39–49). Plaintiff testified that she is unable to work due to "[s]evere depression, anxiety, and bipolar, panic attacks and severe pain." (R. 41).

2

### C. Mental Health

Plaintiff testified that she feels depressed and anxious all the time, and that she gets panic attacks about three times per week with no particular trigger. (R. 46–47). According to Plaintiff, during a panic attack, she feels like an elephant is sitting on her chest; she gets sweaty, experiences rapid heartbeat, and cannot function. (R. 46–47). Plaintiff testified that she has been taking psychiatric medications since 1997, including Valium, Prozac, and Effexor. (R. 43). Plaintiff testified that she has problems with memory and concentration, and that she has decreased energy, anger, agitation, mood swings, and feelings of guilt and/or worthlessness. (R. 47–48). Plaintiff testified that sometimes she feels hyperactive, with racing thoughts and rapid speech. (R. 48–49).

According to Plaintiff, "every day is a bad day," and she will sleep two to three days straight and not get out of bed except to use the bathroom; she showers twice a month. (R. 49–50). Her husband does the cooking, laundry, housework, grocery shopping, and other chores; when she is depressed he brings her meals in bed. (R. 49–50). Plaintiff testified that she couldn't go grocery shopping because "I get there and I start having a panic attack and I have to leave the cart and go home." (R. 50). Plaintiff testified that she has twice been hospitalized for "psychiatric" issues, most recently around 2005. (R. 42). The record does not contain any evidence regarding these hospitalizations.

### D. Neck and Back Pain

Plaintiff also testified that she has chronic neck and lower back pain, and that physical therapy provided no relief. (R. 41). Plaintiff testified that she uses a heating pad to relieve pain in her lower back. (R. 44). Plaintiff also testified that she has radiating pain down her right leg,

3

which she has experienced every day for 10 years. (R. 45). According to Plaintiff, the pain is aggravated by bending, squatting and lifting, and her legs feel weak. (R. 45). Plaintiff testified that she can sit and/or stand 15 minutes, and she can walk to the end of her driveway. (R. 45). Plaintiff testified that she cannot lift and carry heavy objects, and that she has tremors and shaking in her hands. (R. 46).

On or around March 7, 2001, Plaintiff was seen by Dr. Deborah A. Hrustich for a neurosurgical consultation. (R. 220). At the time, Plaintiff complained of neck pain, spasms, and stiffness, and weakness of the left arm. (R. 220). On examination, Plaintiff was not in acute distress, and her gait was normal. (R. 221). She had "increased pain with full flexion, lateral bending and rotation to the left and some funny discomfort in the arm with extension of the neck"; she also had "moderate paraspinous spasm of the cervical region around the trapezii and under the shoulder blade on the left side more so than on the right side." (R. 221). There was also "vague weakness of the biceps," and reflexes were reduced and abnormal on examination of both upper extremities. (R. 221).

On review of a cervical MRI, Plaintiff was found to have "a midline disc herniation at C5-6 with straightening of the spine," and "some settling at this level with bilateral neuroforaminal narrowing and the thecal sac is indented, although the cord is intact." (R. 221). Dr. Hrustich stated that Plaintiff "has significant cervical disease at one level C5-6 with chronic neck pain and mild radicular symptoms over a long period of time." (R. 222). Dr. Hrustich referred Plaintiff for pain management treatment, including "facet blocks and trigger point injections with an exercise program and therapy," noting that if she did not improve, she was a candidate for anterior cervical disc fusion ("ACDF") with allograft and plating at C5-6. (R. 222).

4

Plaintiff did not have the neck surgery. (R. 41). On June 30, 2004, Plaintiff underwent an MRI of the cervical spine, which found "diffuse disc bulges at C5-6 and C6-7 without evidence of central or foraminal narrowing." (R. 256).

On January 31, 2006, Plaintiff saw Dr. Luke Rigolosi for a pain management consultation and an evaluation of cervical spine pathology. (R. 250). Plaintiff reported pain in the cervical spine and into the bilateral upper limbs; achy pain across the base of the neck, and also stabbing pain in the same area. (R. 250). She also had numbness and tingling down each arm, and achy pain in the spine. (R. 250). Her pain was 8/10 on average and 10/10 at worst. (R. 250). She reported that her symptoms were aggravated with any cleaning activities, and they also caused her difficulty sleeping. (R. 250). She was using the pain reliever Lortab, as "prescribed by her primary care physician." (R. 250).

On examination, Dr. Rigolosi noted that:

> She rises from a seated position without difficulty. Gait is nonantalgic reciprocal. Cervical spine range of motion is limited in extension, right side bending, and left lateral rotation with symptoms mostly on the right side. There is tenderness to palpation and trigger points palpated in multiple locations in the upper trapezius region as well as cervical paraspinal musculature. Spurling maneuver causes axial symptoms, right side greater than left.

(R. 251). Dr. Rigolosi noted an MRI of the cervical spine dated June 30, 2004 "reveals diffuse disc bulges at C5-C6 and C6-C7 without evidence of central foraminal stenosis." (R. 251). Dr. Rigolosi diagnosed degenerative disc disease of the cervical spine; he recommended the use of a right sided C7-T1 interlaminar epidural steroid injection. (R. 251). He also prescribed physical therapy and home traction. (R. 251). On May 12, 2006, Plaintiff underwent a right-sided C7-T1 intralaminar epidural steroid injection. (R. 249, 255, 259, 271).

After her date last insured in 2009, Plaintiff continued to report neck and back pain. In doctor visits in April 2012, Plaintiff reported pain in the lower back, buttocks, and neck, which was diagnosed as "ongoing left lower back and buttock pain, SI joint and lumbar sprain/strain." (R. 242, 245, 264). On April 4, 2012, an MRI of her lower spine showed "multi-level degenerative change, most significant at L5-S1." (R. 252, 269). On July 9, 2012, Plaintiff had "ongoing lower back pain with right L5-S1 disc protrusion, resolving left lower back pain sciatica symptoms," and "herniated disks, lumbar and cervical spine." (R. 240, 267).

### E. Gastrointestinal Problems

At the hearing, Plaintiff did not attribute her alleged disability to any gastrointestinal problems. As for records during the relevant time period, in March 2005, Plaintiff underwent an esophagogastroduodendoscopy, which showed "mild esophagitis" and "nonspecific gastritis." (R. 333). On February 2, 2006, Plaintiff saw gastroenterologist Dr. Arthur H Ostrov, and she reported nausea, diarrhea and vomiting. (R. 326). In her past medical history, the following were noted: hyperlipidemia, cervical herniated disk, depression, and irritable bowel. (R. 326). In the "Medications" section, it states that she was using Lortab 7.5/500 three to four times a day for neck pain. (R. 326). She was also using large quantities of Maalox and multiple Tums daily for relief. (R. 326). Plaintiff was diagnosed with Gastroesophageal Reflux Disease. (R. 326).

### F. Primary Care Records

Plaintiff's primary care provider is Dennis Cicchino, a Registered Physician Assistant-Certified at Capitol Region Family Health Care. (R. 282–294). Plaintiff has seen Cicchino about every six months since the mid-90s. (R. 43, 147, 282, 346). The record does not contain any treatment notes associated with Cicchino until 2011, when she reported "stress and nausea,"

6

and was assessed with among other things: degenerative disc disease, chronic neck pain and anxiety/depression. (R. 289, 290, 294). In 2012, Cicchino noted that "MRI shows degenerative disk disease and spinal stenosis of her back. She is going to be seeing Dr. Buttaci in one week for possible injection therapy and/or treatment." (R. 288).

On June 21, 2014, Cicchino wrote a letter supporting Plaintiff's application for Social Security disability, which stated that "[f]or the past 15 years this patient has been treated in our office for major depression, psychological issues, insomnia, mental deterioration, and psychological deterioration secondary to a failed marriage." (R. 282). Cicchino noted that Plaintiff had been treated by a psychologist and psychiatrist in the past. (R. 282). Further, he noted that she had been diagnosed with degenerative disc disease, chronic gastritis secondary to stress associated with irritable bowel syndrome, and she had received therapy for her neck and radicular symptoms. (R. 282). He concluded that Plaintiff "is unable to work secondary to the psychological stresses and physical and mental disorders and should be considered disabled secondary to these factors." (R. 282).

On June 23, 2016, Cicchino completed a Medical Source Statement for Plaintiff. (R. 346–48). He states that Plaintiff has been a patient since 1994 and lists diagnoses of anxiety, agoraphobia, depression, and insomnia. (R. 346). He states that Plaintiff is taking chronic pain medication for degenerative disc disease and spondylolysis. (R. 346). He identifies symptoms of "fatigue, insomnia, pain in neck and back, panic attacks, and depression with possible bipolar symptoms." (R. 346). Cicchino documents loss of range of motion in the neck and back. (R. 346). He assessed that Plaintiff could on an occasional basis lift or carry less than 10 pounds; stand or walk about four hours during an eight-hour day; sit for less than two hours in an eight-

hour day; she needed to periodically alternate between sitting and standing; and that sometimes she would need to lie down during a work shift. (R. 347). Cicchino also assessed that Plaintiff could only occasionally twist, never stoop or crouch, and that she was to avoid hazards such as moving machinery and heights. (R. 347). According to Cicchino, these limitations were "secondary to degenerative changes." (R. 348). As to the date of onset of disability, Cicchino wrote "neck pain 1997." (R. 348). He also cited major depressive disorder as an additional basis for the inability to engage in substantial gainful activity. (R. 348).

### G. The ALJ's Decision

On October 19, 2016, the ALJ issued a decision denying Plaintiff benefits. (R. 18–27). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity during the period from her alleged onset date of December 31, 2003 through her date last insured of March 31, 2009. (R. 23). At step two, the ALJ determined that, under 20 C.F.R. § 404.1520(c), Plaintiff had one "severe" impairment—cervical degenerative disc disease. (R. 23). The ALJ noted that "the record documents some abnormal cervical findings and diagnosis of degenerative disc disease." (R. 24). The ALJ found this impairment severe "because it resulted in more than minimal limitation in the claimant's ability to perform basic work activities." (R. 23).

The ALJ found that "claimant's history of tachycardia" did not constitute a severe impairment because it did not result in more than minimal limitations in the claimant's ability to perform basic work-related activities. (R. 23). Further, the ALJ found that Plaintiff's mental and gastrointestinal disorders "were not medically determinable impairments through March 31, 2009, the date last insured." (R. 24). The ALJ noted the records from Cicchino, dated 2014 and

8

2016, wherein it was reported that: "for the past 15 to 16 years the claimant had been treated for mental issues including depression, psychological issues, insomnia, mental deterioration and agoraphobia," that "[t]he claimant bordered on symptoms of bipolar disease and social anxiety," "[t]he claimant had additional impairments including cervical degenerative disc disease, and chronic gastritis secondary to inflammatory bowel disease," and that "claimant was unable to work secondary to her disorders." (R. 23–24). The ALJ gave Cicchino's assessments "very little weight," because "[a]lthough he reported a treating history with the claimant, he did not provide any medical records including objective clinical or diagnostic findings or treatment evidence regarding impairments during the relevant time period, and the opinion is of little probative value for the time period at issue." (R. 24).

The ALJ found that "the record does not document diagnosis [of] mental health or gastrointestinal disorders from an acceptable medical source." (R. 24). Cicchino was not considered an acceptable medical source. (R. 24). The ALJ noted that L. Hoffman, the State agency consultant, had reviewed the record regarding mental impairments and "assessed that there was no mental medically determinable impairment established and there was insufficient evidence to evaluate the claim." (R. 24). Overall, the ALJ found that "the record does not document diagnosis from an acceptable medical source, and/or treatment for mental or gastrointestinal disorders." (R. 24).

At step three, the ALJ found that, through the date last insured, "the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (R. 24). The ALJ found "that the claimant's impairments do not

9

meet nor equal the requirements of any listed impairment," and that "[a]lthough severe . . . these impairments are not attended, independently or in combination, with the specific clinical signs and diagnostic findings necessary to meet the requirements set forth in Listing 1.00, referable to musculoskeletal impairments."  (R. 24).

At step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that, through the date last insured, she had the RFC "to perform the full range of light work as defined in 20 CFR 404.1567(b)."  (R. 24).  In making this finding, the ALJ considered: "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96-4p."  (R. 24).  The ALJ also considered opinion evidence "in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 24).

In considering Plaintiff's symptoms, the ALJ adhered to a set two-step process: first to determine, "whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably he expected to produce the claimant's pain or other symptoms," and second, once an underlying physical or mental impairment(s) that could reasonably he expected to produce the claimant's pain or other symptoms has been shown, to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."  (R. 24–25).  At step two, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must consider

other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities." (R. 25).

The ALJ noted Plaintiff's testimony that: she had "neck and back pain and mental disorders," she had "a prior psychiatric hospitalization and she was prescribed medication treatment," she "never had neck or cervical surgery, but she was prescribed pain medication," and her "daily activities were limited due to her impairments." (R. 25).

Overall, the ALJ found "that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, as of the date last insured, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 25). In support of this finding, the ALJ noted the following diagnostic studies: an MRI of the cervical spine in 2001, which revealed disc herniation at C5-6, and an MRI of the cervical spine in June 2004, which revealed diffuse disc bulges at C5-6 and C6-7, without evidence of central or foraminal narrowing. (R. 25). The ALJ also noted the report from Dr. Rigolosi, whose clinical findings included "non-antalgic gait, limited cervical motion, tenderness, and trigger points." (R. 25). Dr. Rigolosi had found that Plaintiff's MRI showed diffuse disc bulges without evidence of central foraminal stenosis, diagnosed her with cervical degenerative disc disease, recommended physical therapy, and prescribed an epidural injection. (R. 25).

According to the ALJ, the record lacked further treatment records regarding musculoskeletal disorders through March 31, 2009, the date last insured. (R. 25). Further, the ALJ noted that no other treating or examining source "provided an opinion concerning the

11

claimant's functional capabilities through the date last insured." (R. 25). Although the record contained additional opinions after the date last insured, the ALJ stated that "evaluation of the evidence is unnecessary and the opinion is not entitled to weight through that period." (R. 25).

Overall, the ALJ found that "the record indicates a cervical disorder; however, diagnostic test did not reveal any evidence of stenosis and clinical findings were limited," and the record "contains little treatment notes and any regular, ongoing treatment from the alleged onset date through the date last insured." (R. 26). The ALJ acknowledged that "the claimant may have additional impairments and worsening symptoms and limitations," but found that since the record "does not document additional impairments or worsening findings" through her date last insured, "they add nothing to determination of disability through March 31, 2009 to prove disability for entitlement for period of disability and disability insurance benefits, and evaluation of the evidence is unnecessary." (R. 26).

In sum, the ALJ stated that Plaintiff's RFC assessment was "supported by limited clinical findings and sporadic treatment, at best, from the alleged onset date through March 31, 2009." (R. 26). There was "no evidence of regular ongoing treatment from December 31, 2003 through March 2009, and "no evidence of urgent or emergency care during that time for acute pain." (R. 26). According to the ALJ, "[t]reatment notes in the record do not sustain the claimant's allegations of disabling limitations." (R. 26). Further, the ALJ found that "[t]he credibility of the claimant's allegations is weakened by inconsistencies between her allegations and lack of regular treatment or emergency or urgent care treatment for severe pain." (R. 26). The ALJ did "not doubt that the claimant had cervical disorder and may have experienced some

12

levels of pain and limitations, but only to the extent described in the residual functional capacity above." (R. 26).

At step five, having determined Plaintiff's limitations, the ALJ found that Plaintiff was unable to perform her past relevant work as a licensed practical nurse. (R. 26). But the ALJ concluded that "[t]hrough the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (R. 26). The ALJ noted that "[i]f the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile (SSR 83-11)." (R. 26). Finally, based on an RFC for the full range of light work, the ALJ concluded that through the date last insured, "considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.21." (R. 27). Therefore, the ALJ found that Plaintiff was not under a disability during the relevant time period. (R. 27).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

13

any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The ALJ must follow a five-step analysis in evaluating disability claims:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (citation omitted); *see also* 20 C.F.R. § 404.1520. "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Id.*

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether the plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla. It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion.'" *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447–48

(2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential" and the Court can reject the facts that the ALJ found "'only if a reasonable factfinder would *have to conclude otherwise.*'" *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### C. Analysis

Plaintiff now argues that, in not finding her disabled, the ALJ erred in several respects: 1) failure to fully develop the record; 2) failure to consider irritable bowel syndrome and mental health diagnoses as severe impairments; 3) failure to call a vocational expert; 4) failure to fully credit her testimony; 5) failure to fully credit her treating source; and 6) that the RFC assessment is not supported by substantial evidence. (Dkt. No. 13).

#### 1. **Failure to Develop the Record**

Plaintiff argues that "the ALJ erred in failing to fully develop the record with complete hospital and primary care treatment records known to Social Security." (Dkt. No. 13, p. 10). In particular, Plaintiff contends that "the record compiled by Social Security failed to specifically request, or include records of primary care treatment prior to the DLI of 3/31/09." (*Id.*, p. 8). In response, the Commissioner argues that Plaintiff has failed to identify any gaps in the record, and "no such gaps exist." (Dkt. No. 15, p. 12).

In general, the ALJ "has an affirmative obligation to develop the administrative record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). While the claimant must ultimately prove that she is disabled, it is the responsibility of the ALJ to help develop the claimant's complete medical history; every reasonable effort must be made to help the claimant get medical evidence from her medical sources. *See* 20 C.F.R. § 404.1512. The ALJ, however, is not required to seek

out additional evidence unless there are "obvious gaps" in the administrative record. *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999). Where, for example, the ALJ has "a complete medical history, and the evidence received from the treating physicians is adequate for [the ALJ] to make a determination as to disability," there is no error in the development of an administrative record. *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996).

In this case, Plaintiff alleged disability with a relevant time period of December 31, 2003 to March 31, 2009. (R. 53). She also testified that her primary care provider is Dennis Cicchino, a Registered Physician Assistant-Certified she has seen every six months since the mid-90's. (R. 43). Cicchino states that he has treated her since 1994. (R. 147, 282, 346). Although Cicchino is not a physician, his treatment notes are nonetheless probative as to Plaintiff's condition and limitations during the relevant time period.[1] And yet the record does not contain any treatment notes from Cicchino during the relevant time period whatsoever. According to the case processing notes, in October 2014 the Commissioner inquired as to what treatment Plaintiff received from 2003 to 2009, and Plaintiff responded: "Deborah Hrustich in 2004 for her c spine," Saratoga Schenectady Gastroenterology "in 2003-2004 for IBS," and "Dr. Cicchino at Capital Region Family Health." (R. 176–178). As to records from Cicchino at Capital Region, it is noted that "these records were already received." (R. 178). The notes

---

[1] Indeed, the Regulations now recognize physician assistants as acceptable medical sources. *See* 20 C.F.R. § 404.1502; 20 C.F.R. § 416.902; *see also* SSR 06-03P ("we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work," including physician assistants) (ruling in effect at the time of the ALJ's decision). Moreover, the "length of the treatment relationship and the frequency of examination" are important factors in evaluating evidence. *See* 20 C.F.R. § 404.1527(c).

16

indicate that some records from Capital Region had been received in September 2014. (R. 180). However, these records are dated from 2011 to 2014, after the relevant time period.[2]

Thus, even though Plaintiff apparently saw Cicchino every six months during the relevant time period, the record contains no such evidence.[3] Nor is there any indication that a reasonable effort was made to obtain it, such as a follow-up contact with Cicchino or Capital Region. The ALJ's decision points out that Cicchino "did not provide any medical records including objective clinical or diagnostic findings or treatment evidence regarding impairments *during the relevant time period*." (R. 24) (emphasis added). But the absence of such evidence constitutes an obvious gap in the administrative record.

Since this area was not sufficiently developed, the Court will remand for further proceedings. At a minimum, the ALJ should re-contact Cicchino and Capital Region Family Health for any treatment notes regarding Plaintiff during the relevant time period.[4] *See Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) ("where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate"); *Gallup v. Commr. of Soc. Sec.*, No. 11 Civ. 1345, 2014 WL 2480175, at *13, 2014 U.S. Dist. LEXIS 75187, at *26 (N.D.N.Y. June 3, 2014) (remanding based on "gap in the administrative record");

---

[2] Another note appears to identify the problem, stating that: "47 year old female alleging bipolar, severe anxiety, IBS, herniated discs in neck and back, and insomnia. All MER in file is after DLI. Please review for IE." (R. 297).

[3] The record also suggests that Cicchino prescribed Lortab for Plaintiff during this period. (R. 250) (describing pain reliever used in 2006, "as prescribed by her primary care physician.").

[4] Plaintiff should also make every effort to ensure these records are obtained. To the extent Plaintiff argues that the record is also missing emergency room records documenting diagnoses and treatment for anxiety and panic attacks during the relevant time period, (Dkt. No. 13, p. 9), Plaintiff may submit any such records to the ALJ for consideration on remand.

17

*Casson v. Astrue*, No. 10 Civ. 1537, 2011 WL 6955837, at *8, 2011 U.S. Dist. LEXIS 151199, at *24 (N.D.N.Y. Nov. 9, 2011) (finding that "the ALJ's failure to request the treatment records of Dr. Temnycky resulted in a substantial gap in the record that compels a remand"), *report and recommendation adopted*, No. 10 Civ. 1537, 2012 WL 28300, 2012 U.S. Dist. LEXIS 1228 (N.D.N.Y. Jan. 5, 2012).

### 2. Remaining Arguments

Because the Court is remanding this matter for further development of the record, it does not reach Plaintiff's remaining arguments. The absence of timely treatment notes from Cicchino may have affected much of the ALJ's analysis, including the weight given Cicchino's opinion, the credibility assessment of Plaintiff, the RFC assessment, and the need for a vocational expert. For example, the ALJ gave Cicchino's assessments "very little weight" because, among other things, "he did not provide any medical records including objective clinical or diagnostic findings or treatment evidence regarding impairments during the relevant time period." (R. 24). The ALJ also discounted Plaintiff's reported symptoms because, among other things, "[t]he record contains little treatment notes and any regular, ongoing treatment from the alleged onset date through the date last insured." (R. 26). And the RFC assessment for light work cited Plaintiff's "sporadic treatment" during the relevant time period. (R. 26).

Accordingly, upon remand, the ALJ is directed to further develop and re-evaluate the record, and as necessary, reassess Cicchino's opinion, Plaintiff's credibility, and her residual functional capacity. *See Chandler v. Commr. of Soc. Sec.*, No. 11 Civ. 152, 2012 WL 1935182, at *11, 2012 U.S. Dist. LEXIS 74043, at *32–33 (N.D.N.Y. May 29, 2012) ("As previously discussed, there is an appreciable gap in the record due to the failure to seek medical treatment

18

records for Chandler's proffered claims of back pain and a diagnosis of arthritis. Therefore, remand is appropriate and the ALJ will be directed to consider the additional medical evidence diagnosing Chandler with arthritis in his back, develop the record as necessary to ascertain the proper weight to accord Chandler's credibility, and determine whether Chandler's diagnosis and its effects are sufficient to establish a severe impairment requiring provision of disability benefits."); *Casson v. Astrue*, No. 10 Civ. 1537, 2011 WL 6955837, at *10, 2011 U.S. Dist. LEXIS 151199, at *35 (N.D.N.Y. Nov. 9, 2011) ("On remand, the ALJ should reassess plaintiff's credibility in light of the additional medical and other evidence before him, pursuant to the legal standards outlined above."), *report and recommendation adopted*, No. 10 Civ. 1537, 2012 WL 28300, 2012 U.S. Dist. LEXIS 1228 (N.D.N.Y. Jan. 5, 2012).

IV. CONCLUSION

For these reasons it is

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   January 28, 2019
        Syracuse, New York

*[signature]*
Norman A. Mordue
Senior U.S. District Judge

19